UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-CV-20219-WILLIAMS/REID

KATHERINE MARTINEZ,
*as assignee of Diana Guevara,*
*an insured of Defendant, and individually*,

     Plaintiff,

vs.

GEICO CASUALTY INSURANCE COMPANY,

     Defendant.

_____/

## REPORT AND RECOMMENDATION ON
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on Defendant GEICO Casualty Insurance Company's ("GEICO") Motion for Summary Judgment. [ECF No. 18]. United States District Court Judge Kathleen M. Williams referred the motion to me for a report and recommendation. [ECF No. 19]. The Court has carefully considered the Complaint, GEICO's Motion for Summary Judgment, GEICO's statement of material facts, Plaintiff's response in opposition to the motion for summary judgment and her response to the statement of material facts, GEICO's reply in support of the Motion, and the applicable law. [ECF Nos. 1, 17, 18, 25, 27, 33]. For the reasons discussed below, it is **RECOMMENDED** that Geico's Motion for Summary Judgment [ECF No. 18] be **GRANTED**.

## I. **BACKGROUND**

**A. February 12, 2009 Automobile Accident**

This bad faith insurance case arises out of an automobile accident that occurred on February 12, 2009. [ECF No. 1 at 2]. The following facts are undisputed.[1] The accident involved three vehicles, including a vehicle (an "SUV") driven by Plaintiff's friend, Roxanne Morina. [ECF Nos. 17 at ¶ 1; 25 at ¶ 1].  Riding in the SUV with Morina was Plaintiff Katherine Martinez, and four other friends: Stacy Puerto, Yanitza Morales, Lisandra Morales, and Stephanie Mejia. [ECF Nos. 17 at ¶1; 25 at ¶1]. The accident occurred as Morina was driving southbound on Krome Avenue in Miami-Dade County. [ECF Nos. 17 at ¶1; 25 at ¶1]. When Morina tried to make a U-turn, the SUV was rear ended by a pick-up truck driven by Rene Gonzalez Carranza. [ECF Nos. 17 at ¶1; 25 at ¶1]. The impact spun the SUV into the northbound lane of Krome Avenue. [ECF Nos. 17 at ¶1; 25 at ¶1]. Moments later, the SUV was struck by a northbound automobile driven by Diana Guevara—GEICO's named insured. [ECF Nos. 17 at ¶1; 25 at ¶1, 17-1 at 4]. Guevara and most of the SUV occupants sustained bodily injuries as a result of the second collision. [ECF Nos. 17 at ¶ 23; 25 at ¶¶ 23, 51]. Plaintiff and Stephanie Mejia were airlifted to a hospital. [ECF No. 17-3 at 37]. Plaintiff seriously injured her right leg and pelvis and underwent several surgeries to save the leg from amputation. [*Id.* at 38]. She was hospitalized for more than six weeks. [ECF No. 25 at 13].

## B. GEICO's Investigation of the Claim

Guevara was insured by GEICO under an automobile insurance policy that provided bodily injury coverage in the amount of $10,000 per person and $20,000 per accident. [ECF No. 17-2 at 4]. GEICO received notice of the accident on February 18, 2009. [ECF Nos. 17 at ¶ 3; 25 at ¶ 3; 17-3 at 1.] GEICO began its investigation that same day but discovered a potential coverage issue

---

[1] The Court has determined the facts, which are undisputed unless otherwise noted, based on the parties' submissions, including GEICO's Statement of Material Facts and Plaintiff's Response to Statement of Material Facts [ECF Nos. 17, 25], deposition transcripts and other evidence in the record.

upon learning that the vehicle driven by Guevara at the time of the accident, a 1995 Dodge Ram, was not listed under the insurance policy. [ECF Nos. 17 at ¶4; 17-3 at 5]. GEICO's claim manager instructed the claim adjuster to: (1) obtain a copy of the police report to confirm the details of the loss; (2) issue a reservation of rights and bodily injury excess letter to Guevara; and (3) contact Guevara's personal attorney. [ECF No. 17-3 at 5].

Later that day, the adjuster contacted the offices of Stuart Greenberg, Guevara's attorney. According to the claim file activity log ("ALOG"), Attorney Greenberg's assistant recounted that Guevara was traveling northbound on Krome Avenue when the SUV "appeared in her lane" and she hit the passenger side of the SUV. [ECF No. 17-3 at 8–9]. At least two passengers were airlifted. [*Id.* at 9]. Attorney Greenberg's assistant "became very upset" that liability should be assumed on the part of their client, Guevara, given that the SUV was rear-ended by Carranza's pick-up truck, and the accident did not involve a lane change. [*Id.*]. The claim adjuster informed Greenberg's assistant of the coverage issue and the possibility of claims exceeding the applicable coverage limits. [*Id.*]

On February 19, 2009, GEICO's claim adjuster received a letter of representation from Carranza's attorney enclosing a "Driver Exchange of Information" form. [ECF No. 17-5].  The form identified Carranza, Morina, and Guevara as the drivers involved in the accident and noted that Morina was cited for careless driving in connection with the accident. [ECF No. 17-5 at 2]. The letter of representation stated, however, that "our investigation reveals that this accident was caused by your insured's (Guevara's) negligent operation of a motor vehicle." [*Id.* at 3].

Later that day, GEICO's adjuster contacted Morina and Carranza's insurance carriers, Bristol West and State Farm, respectively, to obtain additional information. [ECF No. 17-3 at 10]. Bristol West's representative advised she had spoken with Guevara's spouse who in turn told her that

Guevara had purchased the 1995 Dodge Ram on the day of the accident. [*Id.*]. Guevara's spouse also told Bristol West's representative that Morina had admitted fault and Guevara did not see the SUV because the SUV's had its lights off. [ECF No. 17-3 at 11]. GEICO's adjuster also tried calling Morina, but her voicemail box was full. [*Id.* at 13].

That same day, GEICO's adjuster sent Guevara a reservation of rights letter explaining to Guevara that the 1995 Dodge Ram might not meet the definition of an "owned auto" under the insurance policy. [ECF No. 17-6]. GEICO also sent Guevara a letter explaining the policy's bodily injury limits, the possibility of claims exceeding the applicable limits, Guevara's right to contribute personal funds to any claims made against her, and her right to retain an attorney to protect her interest in excess of the policy limits. [ECF No. 17-7 at 3].

On February 21, 2009, GEICO tasked a field representative with obtaining a long form police report, a statement from Morina, and the identities of the five SUV passengers. [ECF No. 17 at ¶13; 25 at ¶13; 17-3 at 20]. The field representative acknowledged receipt of the assignment on February 23, 2009. [ECF No. 17-3 at 20].

Then, on March 5, 2009, GEICO's claim manager discussed the claim with the adjuster and in-house counsel. [ECF Nos. 17 at ¶15; 17-3 at 25].  According to the claim file notes, it was decided at the meeting that the matter would be referred to outside counsel to arrange a global settlement conference. [ECF No. 17-3 at 25]. Later that day, however, after receiving a copy of the police report, GEICO's adjuster wrote in the ALOG that "it appears [our] insured has no liability" and "let's discuss if we want to set up a global [settlement conference]." [ECF No. 17-3 at 26]. The police report stated: "contributing cause #1—careless driving—driver of [vehicle 1, Roxanne Morina] failed to use duecare [*sic*]." [ECF No. 17-1 at 3]. The police report indicated that Guevara and four of the five SUV non-driving passengers, including Plaintiff, suffered "incapacitating"

4

injuries. [ECF No. 17-1 at 3]. Drivers Morina and Carranza sustained "possible" injuries. [ECF No. 17-1 at 1]. The next day, GEICO's adjuster conducted a search of Guevara's vehicle, the 1995 Dodge Ram, and determined it was registered to a private owner in Hialeah, Florida. [ECF No. 17-3 at 29].

On March 14, 2009, GEICO sent a fax to Attorney Greenberg requesting proof of purchase of the 1995 Dodge Ram in an effort to resolve the coverage issue. [ECF No. 17-13]. The adjuster noted in the claim file that GEICO still needed a statement from the SUV occupants and more details about the injuries. [ECF No. 17-3 at 33]. Nonetheless, that same day, GEICO referred the case to outside counsel to arrange a global settlement conference. [ECF No. 17-11]. The referral form contained a note that "it appear[ed]" several parties were injured, but GEICO was unable to assess the extent of the injuries sustained by the SUV occupants. [ECF No. 17-11]. GEICO sent letters to Plaintiff and the other claimants explaining that the most GEICO could pay for an individual claim was $10,000 and no more than $20,000 for all claims presented. [ECF No. 17-12 at 5]. GEICO explained that it was attempting to resolve all bodily injury claims within the available policy limits, and seven parties were making claims for injuries. [*Id.*] The letter asked the recipient to attend a settlement conference to be scheduled by GEICO's outside counsel and to complete an enclosed medical authorization form or submit medical documentation within 14 days of the date of the letter. [*Id.*] The recipient's treatment did not have to completed at the time, but the information was needed for GEICO's continued evaluation. [*Id.*]

On March 18, 2009, a GEICO field representative visited the SUV occupants to gather information about their injuries. [ECF No. 17-3 at 34]. The field representative visited Plaintiff's home and learned from her mother that Plaintiff was still hospitalized. [ECF No. 17-3 at 38]. To date, Plaintiff had had seven surgeries. Doctors were able to save her right leg from amputation.

[*Id.*]. Plaintiff would undergo ankle surgery the next day. [*Id.*] Plaintiff also fractured her right knee and pelvis. GEICO's representative learned that as of that date, however, Plaintiff had not hired an attorney. [ECF No. 17-3 at 38].

Stephanie Mejia's father informed the GEICO field representative that his daughter had been airlifted to the hospital and was treated for a lacerated spleen, a lacerated forehead that required 27 stitches, a fractured pelvis, and internal bleeding. [ECF No. 17-3 at 37]. She was hospitalized for seven days. [*Id.*] As for the Morales sisters, their mother told the field representative that Lisandra had a small scar on her elbow, extensive bruising on her right shoulder, but no fractures. [ECF No. 17-3 at 36]. Lisandra's sister, Yanitza, was taken to the hospital due to a fractured right clavicle and a laceration to her forehead that required 7 stitches. The field representative was unable to obtain a home address for Stacy Puerto, but according to Lisandra Morales, Stacy was "doing fine." [ECF No. 17-3 at 38]. The field representative noted she would need to follow up with Roxanne Morina about her injuries. [*Id.*].

On March 19, 2022, GEICO's in-house counsel sent an internal communication stating: "based on the information we have received thus far[,] please set global reserves at $20k . . . ." [ECF No. 17-3 at 42–43]. The communication also noted that a global settlement conference was being set up by outside counsel. [*Id.*]. That same day, GEICO's adjuster learned that State Farm, Carranza's carrier, had decided to tender the policy limit of $10,000 to Plaintiff and hold the remaining amount of $10,000 for a global settlement. [*Id.* at 43]. The State Farm representative also told GEICO's adjuster that its attorney would like to meet with GEICO's counsel and coordinate a global settlement conference.

On March 22, 2009, GEICO sent letters to the parties reiterating that GEICO was trying to resolve all bodily injury claims within the policy limits and that seven parties were claiming

injuries. [ECF No. 17-16]. The letters informed the parties, including Plaintiff, that "GEICO Casualty Company, on behalf of our insured, will hereby tender the aggregate policy limits of $20,000 to resolve all bodily injury claims of all claimants." [ECF No. 17-16 at 3]. Due to a conflict of representation, GEICO had reassigned the file to Attorney John F. Kennedy of the Law Office of Golden and Grimes, who would be contacting them with details about the settlement conference. [*Id.*]

On March 25, 2009, GEICO's adjuster spoke again with the Morales sisters' mother who stated in part that she did not believe any of the other injuries "compared to Katie's who is still in the hospital and almost lost her leg." [ECF No. 17-3 at 51]. The adjuster also spoke with Stacy Puerto's mother who told her Stacy was overall "ok" but had a bruise on her forehead and was going to see an orthopedic doctor because she had hit her knee on the door and had "crack" it to make it feel better. [*Id.*]

On March 26, 2009, Plaintiff's mother contacted the adjuster to inform she would be unable to attend the global settlement conference because Plaintiff was still hospitalized. [ECF No. 17-3 at 53]. The adjuster told Plaintiff's mother that she could join telephonically. [*Id.*].

On April 1, 2009, GEICO received a copy of a handwritten letter from the seller of the 1995 Dodge Ram, confirming that Guevara purchased the car on February 12, 2009 (the date of the accident). [ECF No. 17-17]. On April 4, 2009, GEICO's counsel, Attorney John Kennedy, informed GEICO that the global settlement conference was scheduled for April 23, 2009, and that all parties had agreed to attend, except for Morina. [ECF No. 17-3 at 66].

On April 16, 2009, GEICO received a letter of representation from attorney Michael Olin, informing GEICO that his firm represented Plaintiff and requesting the mandatory statutory

disclosures. [ECF No. 17-20]. That same day, GEICO sent Plaintiff's counsel an affidavit of coverage and a certified copy of Guevara's policy. [ECF No. 17-23].

On April 21, 2009, GEICO's counsel was notified that Stephanie Mejia's attorney would be unable to attend the global settlement conference scheduled for April 23, 2009. [ECF No. 17-3 at 79]. The settlement conference was rescheduled for April 30, 2009. [*Id.*]

### C. GEICO's Tender of the Policy Limits and Subsequent Litigation

The global settlement conference was conducted on April 30, 2009. [ECF No. 17-3 at 86]. Plaintiff was still hospitalized, but her attorney, Michael Olin, attended on her behalf. [*Id.*; ECF No. 25 at ¶ 35]. GEICO's counsel informed the parties GEICO would tender $10,000 to Plaintiff. *See id.* [*Id.*]. Later that day a GEICO field representative hand delivered the tender to Plaintiff's counsel with an accompanying release. [ECF No. 17-25]. Plaintiff's counsel confirmed receipt of the tender but explained that he needed to discuss the matter with his client as he had been recently retained. [*Id.* at 1]. Further, he needed to review the claim and the events that took place after the accident to determine whether his client could accept the tender. [*Id.*]

Between May and September 2009, GEICO's counsel, Attorney Kennedy, emailed Plaintiff's counsel regarding the tender and Plaintiff's release of the claim. [ECF No. 17-26]. In response, Plaintiff's counsel requested information contained in GEICO's claim file, such as the date GEICO was notified of the accident, the date GEICO first contacted Plaintiff or her relatives, and records of those communications. [ECF No. 17-21, 17-26]. GEICO complied with Plaintiff's requests. [*Id.*].

On September 23, 2009, Plaintiff rejected GEICO's tender by letter. [ECF No. 17-27]. Plaintiff's counsel explained that GEICO knew long before April 30 that Plaintiff's injuries were far more significant than the policy limits and that liability against Guevara was assured. [*Id.*]. The

letter stated that Plaintiff would be filing suit shortly. [*Id.*]. GEICO informed Guevara that its efforts to resolve Plaintiff's claim were unsuccessful. [ECF No. 17-29].

On December 24, 2009, Plaintiff filed a negligence action against Guevara, Morina, and Morina's mother. GEICO retained Golden and Grimes, P.A. to defend Guevara. [ECF No. 17-31]. GEICO notified Guevara about the lawsuit and the possibility of an excess judgment and her right to hire personal counsel. [ECF No. 17-32]. The underlying litigation continued from 2010 to 2018. On October 5, 2018, Guevara agreed to a stipulated final judgment in favor of Plaintiff in the amount of $2 million. [ECF No. 17-34].

### D. Plaintiff's Bad Faith Action and GEICO's Motion for Summary Judgment

Plaintiff commenced this action to hold GEICO responsible for the $2 million judgment, bringing a single claim for bad faith under Florida common law. [ECF No. 1]. GEICO moved for summary judgment, arguing that no reasonable jury could find that its conduct amounted to bad faith or that its conduct caused the entry of the excess judgment against Guevara. [ECF No. 18]. GEICO argues it fulfilled its good faith duties to Guevara by investigating liability and damages, promptly offering the full aggregate $20,000 bodily injury policy limits to all claimants, coordinating a global settlement conference with all claimants to try to resolve as many claims as possible within the available policy limits, and keeping Guevara informed of the claim resolution process. [ECF No. 18 at 2].

### E. Plaintiff's Response in Opposition to GEICO's Motion for Summary Judgment

In response, Plaintiff argues that GEICO failed to comply with each of its fiduciary duties to Guevara and, at the least, genuine issues of material fact remain which preclude the entry of summary judgment. [ECF No. 27 at 12]. Plaintiff claims that GEICO failed to: (1) conduct a timely investigation; (2) keep its insured appropriately informed; (3) timely tender its $10,000 policy

limits to Plaintiff, thereby failing to protect Guevara from the $2 million judgment. [ECF No. 27 at 2]. Plaintiff also contends that GEICO continued to act in bad faith toward its insured throughout the subsequent litigation. [*Id.*]. According to Plaintiff, whether GEICO's actions were reasonable is a question for the jury and must be considered under the totality of the circumstances. [*Id.* at 7].

## II.     LEGAL STANDARD

Summary judgment is appropriate when there is "no genuine issue as to any material fact [such] that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also* Fed. R. Civ. P. 56. "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Feijoo v. Geico Gen. Ins. Co.*, 137 F. Supp. 3d 1320, 1325–26 (S.D. Fla. 2015) (citing *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir.1997)). "An issue of fact is 'genuine' if the record, taken as a whole, could lead a rational trier of fact to find for the non-moving party." *Id.* at 1326.

The moving party has the initial burden of showing the no genuine issue remains as to any material fact. *Id.* "In assessing whether the moving party has met this burden, the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the non-moving party." *Id.* (citing *Denney v. City of Albany*, 247 F.3d 1172, 1181 (11th Cir.2001)). Once the moving party satisfies its initial burden, the burden shifts to the non-moving party to come forward with evidence showing a genuine issue of material fact that precludes summary judgment. *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002); *see also* Fed. R. Civ. P. 56(e).

"The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find for the non-

movant." *Feijoo*, 137 F. Supp. 3d at 1326 (cleaned up) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992). But if the record, taken as a whole, cannot lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial, and summary judgment is proper. *Feijoo*, 137 F. Supp. 3d at 1326 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

### III.   ANALYSIS

#### A. Bad Faith Law in Florida

In diversity cases, federal courts are bound to apply the substantive law of the forum state; here, Florida. *See Ilias v. USAA Gen. Indem. Co.*, 61 F.4th 1338, 1344 (11th Cir. 2023). "Florida's bad-faith law 'imposes a fiduciary obligation on an insurer to protect its insured from a judgment that exceeds the limits of the insured's policy,' otherwise known as an 'excess judgment.'" *Id.* (quoting *Harvey v. GEICO Gen. Ins. Co.*, 259 So. 3d 1, 3 (Fla. 2018)). Although this duty of good faith is one that the insurer owes to the insured, Florida law authorizes the injured third party to sue the insurer directly for its bad-faith failure to settle on the insured's behalf. *Id.* "Any damages claimed by the insured (or the [injured third party] standing in his shoes) 'must be caused by the insurer's bad faith.'" *Id.* (quoting *Am. Builders Ins. Co. v. Southern-Owners Ins. Co.*, 56 F.4th 938, 945 (11th Cir. 2023)).

A bad faith claim under Florida law has two elements: (1) bad faith conduct by the insurer, which (2) causes an excess judgment to be entered against the insured. *Id.* Regarding cases involving multiple claimants, the Eleventh Circuit has explained:

> [W]hen multiple claims arise from a single incident, the insurer's "good faith duty
> to the insured requires it to fully investigate all claims . . . , keep the insured

> informed of the claim resolution process, and minimize the magnitude of possible
> excess judgments against the insured by reasoned claim settlement." *Farinas v. Fla.*
> *Farm Bureau Gen. Ins. Co.*, 850 So. 2d 555, 561 (Fla. Dist. Ct. App. 2003). The
> insurer retains "a certain degree of discretion in deciding how to approach decisions
> of settlement and defense." *Id.* Based on that discretion, the insurer may "enter[ ]
> into *reasonable* settlements with some claimants to the exclusion of others." *Id.*

*Aldana v. Progressive Am. Ins. Co.*, 828 F. App'x 663, 669 (11th Cir. 2020). Under Florida law,

the question of whether an insurer has acted in bad faith in handling claims against the insured is

determined under the totality of the circumstances standard. *Berges v. Infinity Ins. Co.*, 896 So. 2d

665, 680 (Fla. 2004). "The question of whether this standard has been met is ordinarily for the jury

to decide." *Mesa v. Clarendon Nat. Ins. Co.*, 799 F.3d 1353, 1359 (11th Cir. 2015). Whether the

insurer acted with "reasonable diligence" and "ordinary care" are ordinarily factual considerations

to be decided by a jury. *Id.* Nonetheless, both the Eleventh Circuit and Florida courts have granted

summary judgment where "[t]here is no sufficient evidence from which any reasonable jury could

have concluded that there was bad faith on the part of the insurer," *Eres v. Progressive Am. Ins.*

*Co.*, 998 F.3d 1273, 1278 (11th Cir. 2021) (alteration in original) (quoting *Boston Old Colony*, 386

So. 2d at 785).

## B.  Whether GEICO Fully Investigated All Claims

GEICO argues that, as a matter of law, it complied with its good faith duty to fully

investigate the claims against Guevara. Plaintiff disagrees, arguing that a reasonable jury could

conclude that GEICO failed to fully investigate the potential claims. [ECF No. 27 at 9]. She claims

GEICO made only the following attempts to contact the passengers of the SUV: (1) a phone call

to Roxanne Morina on February 19, 2009 which was directed to voicemail; (2) the field

representative's interviews of the occupants or their parents on March 18, 2009; and (3) a phone

call to Stacy Puerto's mother on March 25, 2009. Plaintiff also points out that GEICO did not

obtain the long-form police report until three weeks after the accident and contacted the SUV

occupants two weeks after obtaining the report. She argues GEICO took no steps to investigate the competing claims between February 19, 2009 and March 5, 2009. Finally, Plaintiff claims GEICO's own claims manual require adjusters to try contacting potential claimants within one hour of receipt of the claim.

GEICO argues in its reply that Plaintiff disregards its efforts to investigate the claim by contacting the other insurers and the parties' attorneys. And any evidence that GEICO allegedly failed to comply with its claims manual is not evidence of bad faith because policies and manuals may contain guidelines that go beyond what is reasonable and proper under the circumstances. *See Altheim v. GEICO Gen. Ins. Co.*, 8:10-CV-156-T-24 TBM, 2011 WL 1429735 (M.D. Fla. Apr. 14, 2011). GEICO adds that Plaintiff has not established how GEICO's alleged deficient investigation caused the excess judgment against Guevara. And, in any case, GEICO sought to resolve the claims through a global settlement conference, even before knowing the full extent of all the injuries of the claimants. [ECF No. 33 at 7–8].

The Court finds that, viewing the record as a whole, GEICO acted reasonably in investigating the claims. At the outset, GEICO's adjuster knew that Guevara disputed liability; GEICO's immediate obligation, therefore, was to investigate liability and to answer any of Guevara's questions regarding liability. *See Johnson v. Geico Gen. Ins. Co.*, 318 F. App'x 847, 850 (11th Cir. 2009) (explaining insurer had an immediate obligation to investigate liability where its insured disputed liability). Here, GEICO received notice of the claim on February 18, 2009. That same day, GEICO's adjuster contacted Guevara's attorney, who disputed any claim that Guevara was liable, arguing the SUV was rear ended before the collision with Guevara's vehicle and the incident did not involve a lane change. Guevara's attorney also informed the field representative that two passengers had been airlifted. The next day, representatives for State Farm

and Bristol West confirmed two passengers had been airlifted. Also on February 19, the field representative called Roxanne Morina, the driver of the SUV, but her voicemail box was full.

Indeed, the ALOG contains entries for February 18 and 19 regarding the coverage issue, that is, whether the 1995 Dodge was covered under the insurance policy. But the ALOG similarly reflects that, immediately after receiving notice of the accident, GEICO began gathering information about the claimants and attempted to contact the driver of the SUV. As soon as GEICO obtained the police report on March 5, 2009, GEICO's claim manager noted in the claim file that the matter would be referred to outside counsel to arrange a global settlement conference. As GEICO continued to gather more information, on March 18, 2009, a field representative visited the SUV occupants and their parents to learn more about their injuries. Then, on March 22, 2009, GEICO informed all claimants that it would tender the aggregate policy limits of $20,000 and that outside counsel would contact them with details about the global settlement conference.

These facts align with *Montanez v. Liberty Mutual Fire Insurance Co.*, where Judge Ruiz determined that the insurer acted with due diligence to its insured throughout its investigation of the claims:

> After learning of the accident, Defendant diligently investigated a potential coverage issue, sought out police and events reports, contacted and advised its insured, and offered, within thirty-two days, to settle all claims by tendering its fully policy limits in compliance with *Powell*. Defendant did so in the absence of a specific demand from Plaintiff and without any indication that might suggest urgency in the resolution of Plaintiff's claim.

478 F. Supp. 3d 1242, 1248 (S.D. Fla. 2019), *aff'd*, 824 F. App'x 905 (11th Cir. 2020).

Like *Montanez*, GEICO diligently investigated a potential coverage issue, sought out the police report and contacted the parties' representatives, and advised its insured, and offered within thirty-two days to settle all claims by tendering the $20,000 aggregate policy limits. Additionally, GEICO tendered the aggregate policy limits in the absence of a specific demand from Plaintiff and

14

without any indication that might suggest urgency in the resolution of her claim. Thus, under these circumstances, the Court finds that GEICO complied with its good faith duty to fully investigate the claims. *See also Johnson*, 318 F. App'x at 850 ("An insurer—acting with diligence and due regard for its insured—is allowed a reasonable time to investigate a claim; no obligation exists to accept a settlement offer . . . or to tender policy limits in advance of a settlement offer . . . without time for investigation.").

### C. Whether GEICO Kept the Insured Informed of the Claim Resolution Process

GEICO argues summary judgment is proper because no reasonable jury could conclude that GEICO acted in bad faith in its handling of Plaintiff's bodily injury claim, including whether it kept Guevara informed of the claim resolution process. Plaintiff responds that nothing in the "mostly incomprehensible letters" GEICO sent to Guevara satisfied this burden. She argues GEICO sent "rote form" letters containing no specific information regarding the facts and circumstances of her case. [ECF No. 27 at 8].

Plaintiff, however, offers no examples of the "incomprehensible" language in the letters nor does she explain how any deficiencies caused the excess judgment against Guevara. As discussed, a causal connection between the damages claimed and the insurer's bad faith is required to support a claim of bad faith. *See Mesa*, 799 F.3d at 1360 (citing *Perera v. U.S. Fid. & Guar. Co.*, 35 So. 3d 893 (Fla. 2010)). And a review of the exhibits shows that the correspondence sent to Guevara was standard and provided sufficient notice to Guevara about her rights under the

policy, the status of the claim, and the possibility of an excess judgment. [*See, e.g.*, ECF No. 17-6, 17-7, 17-12]. A March 14, 2009 letter states in part:

> Dear: Ms. Guevara,
>
> I am writing to keep you advised of the status of this case.  Your GEICO Casualty Company,  policy provides Bodily Injury limits of $10,000 per person and $20,000 per occurrence.  The most GEICO can pay is $10,000 for any one claimant, and, no more than $20,000 for all claims presented.
>
> We are attempting to resolve all bodily injury claims within the available policy limits. There are 7 parties making a claim for injuries.

[ECF No. 17-12].

Toward the end of the letter, GEICO informed Guevara that it would continue to do its best to settle all claims *within the policy limits* and secure releases from all claimants. It also informed Guevara about her right, but not need, to hire her own attorney. This letter and others in the record indicate that GEICO kept Guevara informed about the possibility of a judgment in excess of the policy limits and the steps she could take to avoid the same. *See Berges*, 896 So. 2d at 668–69. In sum, Plaintiff has failed to show that GEICO did not comply with its duty of keeping Guevara informed about the resolution process, nor has it shown how any deficiencies in the communication caused the excess judgment.

**D. Whether GEICO Minimized the Magnitude of Possible Excess Judgments Against the Insured by Reasoned Claim Settlement**.

Next, Plaintiff argues that a reasonable jury could find in her favor that GEICO unduly delayed tendering the per-person $10,000 policy limits to her and that such conduct caused the excess judgment against Guevara. Again, I disagree. Several courts in this circuit have held that summary judgment is proper when the insurer conducts a weeks-long investigation and then tenders the policy limits to a seriously injured claimant.

In *Mesa*, the Eleventh Circuit held that the plaintiff had failed to provide sufficient evidence for a reasonable jury to find that insurer acted in bad faith. *Id.* at 1359. *Mesa* involved multiple claimants, including plaintiff Carlos Mesa who sustained serious injuries and the loss of an eye. *Id.* The Eleventh Circuit concluded that the insurer did not act in bad faith in handling Mesa's claim because it immediately commenced an investigation, and, within 17 days of being notified of the accident, the insurer offered the multiple claimants the full $20,000.00 per accident liability limit amount in furtherance of a global settlement. *Id.* Further, there was no evidence in the record that Mesa ever communicated an unwillingness to participate in a global settlement. *Id.* Regarding causation, the Eleventh Circuit explained that although the insurer might have been negligent in failing to keep its insured advised of settlement opportunities, the probable outcome of the litigation, and the possibility of an excess judgment, such negligence was not the cause of the excess judgment. *Id.*

Then, in *Valle v. State Farm Mutual Automobile Insurance Co.*, Judge King granted the insurer's motion for summary judgment, explaining State Farm "went above and beyond" its duty by taking steps to ensure that all claimants would receive a fair share of the policy limits. No. 08-22117-CV, 2010 WL 5475608 (S.D. Fla. Jan. 15, 2010). Judge King added that State Farm did not indiscriminately settle selected claims while ignoring others, rather, it took a reasonable approach, "and under [such] circumstances no reasonable jury could find State Farm acted in bad faith." *Id.* "Florida law," Judge King wrote, "does not require an insurer to abide by one claimant's wishes to satisfy another claimant; it merely requires an insurer to attempt to reach a reasoned settlement." *Id.*

The Eleventh Circuit affirmed Judge King's entry of summary judgment in *Valle v. State Farm Mut. Auto. Ins. Co*, 394 F. App'x 555 (11th Cir. 2010). The Court rejected plaintiff Valle's

primary argument that State Farm should have resolved the insured's liability to her sooner by tendering to her the per-person policy limit before the settlement conference. *Id.* at 557. Although, in limited circumstances, an insurer's delay in settling claims can contribute to a bad faith claim, the Eleventh Circuit acknowledged, "such a willful and unreasonable delay must also increase the risk of the insured's exposure to excess liability . . . . ." *Id.* In other words, "the [conduct] must be unreasonable from the perspective of the insured, not unreasonable from the perspective of the third-party claimant." *Id.* Further, Valle had offered no evidence to demonstrate that State Farm knew or should have known "that its four-and-a-half-month resolution of a policy proceeds distribution in a fatal car accident case involving eight potential claimants increased [the insured's] exposure to excess liability. *Id.* Specifically:

> Valle made neither a formal settlement demand to State Farm nor indicated in any way a unique urgency in the resolution of her claim. Though Florida law requires no formal settlement demand in a bad faith action, *Powell,* 584 So. 2d at 14, either a demand or an indication that extraordinarily prompt resolution was requested would indicate to State Farm that its efforts at obtaining a global settlement might increase [the insured]'s exposure to liability. In this case, Valle conduct indicated the opposite—she agreed to participate and did participate in the collective settlement negotiations right up until the moment she rejected State Farm's policy-limits offer.

*Id.*

Finally, in *Houston v. Progressive American Insurance Co.*, No. 8:13-CV-194-T-35AEP, 2014 WL 12576820, at *5 (M.D. Fla. May 19, 2014), the United States District Court for the Middle District of Florida rejected plaintiffs' theory that the insurer, Progressive American Insurance Company, should have immediately tendered a full per-person policy limit to the "most injured" claimant. The court explained:

> [T]here is no duty under Florida law for an insurer in a multiple competing claimant situation to immediately tender a full split limit to the most injured victim, even where the insurer knows, and the other claimants agree, which victim is the "most injured."

*Id.* at *5.

The undisputed facts show that GEICO began investigating the claim the day it received notice of the claim and that it simultaneously gathered information regarding coverage issues, the incident, and the claimants' injuries between February 18 and April 30, 2009. Like *Montanez*, within 32 days of first learning of the accident, GEICO offered the full policy limit to the claimants and proposed a global settlement conference. *See Montanez*, 824 F. App'x 905. Plaintiff, however, never indicated a unique urgency to resolve her claim or an unwillingness to settle before the April 30, 2009 global settlement conference. *See Valle*, 394 F. App'x 555. The claimants, including Plaintiff, agreed to participate in a global settlement conference as early as April 4, 2009. Michael Olin, who notified GEICO he had been retained to represent Plaintiff on April 16, 2009, attended the April 30, 2009 global settlement conference and did not formally reject the tender until September 23, 2009 after he requested the claim file information from GEICO. Taken as a whole, the record shows GEICO attempted to reach a reasoned settlement with all claimants. Under such circumstances, no reasonable jury could find GEICO acted in bad faith.

There is no evidence in the record suggesting GEICO knew it was exposing Guevara to excess liability by failing to immediately tender the per-person policy limits to Plaintiff and by proposing a global settlement conference 32 days after first learning of the accident. Plaintiff argues her acceptance of State Farm's tender on March 20, 2009 supports her position that GEICO's April 30, 2009 tender was untimely and in bad faith. But, "the mere existence of a scintilla of evidence" in support of the Plaintiff's position is insufficient. *Feijoo*, 137 F. Supp. 3d at 1326. There must be evidence on which the jury could reasonably find for the nonmovant, here, Plaintiff. Conclusory testimony from her expert that GEICO "improperly delay[ed] its tender" and Plaintiff's assertion that she would have accepted GEICO's tender a month earlier, even viewed

in a light most favorable to Plaintiff, do not lead to an inference that GEICO engaged in bad faith conduct, such as willfully refusing to investigate the claim or prioritizing coverage issues in place of minimizing exposure to its insured.

### E. Whether Geico Continued to Act in Bad Faith Toward Guevara in the Subsequent Litigation.

Finally, Plaintiff argues summary judgment is not proper because there is sufficient evidence that GEICO continued to act in bad faith after Plaintiff rejected GEICO's tender of the per-person policy limits. Plaintiff argues that GEICO ignored Plaintiff's proposals or summarily rejected them and refused to allow Guevara to enter into any stipulated final judgment. [ECF No. 27 at 11].

GEICO argues that an insurer owes no duty to its insured to enter into a consent judgment in excess of the policy limits. I agree. The Eleventh Circuit has explained:

> While an insurer has a duty to act in good faith to offer the policy limits under appropriate circumstances to avoid exposing its insured to a judgment in excess of those policy limits, it has no duty on behalf of its insured to agree to a consent judgment in excess of policy limits and then subject itself to a suit for bad faith for the amount in excess of the policy limits.

*Kropilak v. 21st Century Ins. Co.*, 806 F.3d 1062 (11th Cir. 2015). Florida's Second District Court of Appeal, relying on *Kropilak*, recently held: "The obligation to negotiate and settle claims on behalf of its insured is defined by and bounded within the insurance contract itself; an insurer does not ordinarily have a duty to pay a claim in excess of a policy's limit." *Markuson v. State Farm Mut. Auto. Ins. Co.*, 2023 WL 5986322, at *2 (Fla. 2d DCA 2023). Here, Plaintiff rejected the tender for the policy limits and filed the underlying lawsuit a few months after rejecting the tender to try to recover an amount in excess of the policy limits. GEICO at that point had no duty to a pay

a claim in excess of the $10,000 per person policy limit. For this reason, GEICO did not act in bad faith toward Guevara in refusing to settle for an extracontractual amount.

## CONCLUSION

Even considering the totality of the circumstances in a light most favorable to Plaintiff, there are no genuine issues of material fact regarding Plaintiff's bad faith claim. Because GEICO did not, as a matter of law, act in bad faith, it is **RECOMMENDED** that GEICO's Motion for Summary Judgment be **GRANTED**. [ECF No. 18].

## OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1) and Local Magistrate Rule 4(a), Plaintiff has **FOURTEEN** days from the date of this Report and Recommendation to serve and file written objections, if any, with the District Judge. *See generally Jeffrey S. by Ernest S. v. State Bd. of Educ. of State of Ga.*, 896 F.2d 507 (11th Cir. 1990). Failure to timely file objections will bar a *de novo* determination by the district judge of anything in this Report and shall constitute a waiver of a party's "right to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions." 11th Cir. R. 3-1; *see also Harrigan v. Metro-Dade Police Dep't Station #4*, 977 F.3d 1185, 1191–92 (11th Cir. 2020); 28 U.S.C. § 636(b)(1)(C).

**SIGNED** this 7th day of December, 2023.

_____
LISETTE M. REID
UNITED STATES MAGISTRATE JUDGE


cc:  **All Counsel of Record**